### RENTON v. REILLY.

(Circuit Court, E. D. New York. December 11, 1909.)

PATENTS (§ 328*)—INVENTION—FLOOR-JOINTS FOR WATER-CLOSETS.
    The Renton patent, No. 748,418, for improvements in floor-joints for water-closets, is void for anticipation and lack of invention.

In Equity. Suit by Herbert S. Renton against Martin J. Reilly. Decree for defendant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Henry D. Williams, for complainant.
Frank v. Briesen, for defendant.

CHATFIELD, District Judge. The complainant claims rights under a patent issued to him upon the 29th day of December, 1903, No. 748,418, for what he calls improvements in floor-joints for water-closets. A statement of the six claims as set forth in the letters patent will make clear certain questions raised by the issues.

Claim 1 is as follows:

"1. A floor-flange for a water-closet bowl, comprising an annular clamping-plate for connection with the bowl and an annular pipe-holding part projecting downward from the clamping-plate and having a converging inner wall of substantial length to afford a long clamping-surface for the pipe."

Claim 2 is the same, with the insertion of the words "with a solder-receiving enlargement therein" after the words "converging inner wall."

Claim 3 is the same as claim 2 except that the words "solder-receiving enlargement" are not used, and in their place is inserted "sharply inclined at its upper part and converging uniformly below the sharply-inclined part."

Claim 4 is as follows:

"4. A floor-joint for water-closets, comprising a floor-flange having a clamping-plate for connection with the bowl and having an annular pipe-holding part with a converging inner wall of substantial length, a sewer-pipe within the pipe-holding part and expanded in contact with the wall thereof, a bowl having a recessed base and a spud projecting therefrom, a gasket extending between the base and floor-flange and also between the spud and pipe, and means for clamping the clamping-plate of the floor-flange to the bowl."

Claim 5 is substantially the same as claim 4, with the addition of the provision for "a solder-receiving enlargement."

Claim 6 is the same as claim 5, except that the words "solder-receiving enlargement" are stricken out, and (as in claim 3) the phrase as to the sharply-inclined upper part of the converging inner wall is inserted. Claim 6 also has the added statement "substantially as set forth"; this phrase not being present in any of the other claims.

The complaint is in the usual form, charging the defendant with infringement of the above-recited patent, and the answer, while denying infringement, not only enumerates a number of patents which are alleged to be anticipatory, but also asserts prior knowledge for a considerable period in the trade generally. The defendant further denies any invention on the part of the complainant prior to use by the defendant's foreman some year or more before the application for a patent, and also argues invalidity based upon the language of the patent itself.

It is apparent from the record that the needs of the plumbing or building trade, and also the course of invention as disclosed by the different patents introduced and the testimony of the witnesses, followed two general lines. The first of these lines has to do with joints or connections between sinks and similar structures, while the second line of progress had to do with the particular joint or pipe-connection present in all water-closets since the use of any porcelain self-sup-

porting bowl. The fundamental difference between these two lines of development or the structures for each purpose lies in the fact that, in the case of a sink or wash-bowl, the joint or connection at the top of the pipe with the bottom of the sink is above the trap and does not need to be impervious to water or air, except in such a way as to prevent leakage, while in the construction of houses or rooms to be occupied by living creatures any joint below the trap or valve in direct connection with a sewer pipe must be hermetically sealed against the escape of gas; it being well known that such gas is frequently without odor, and may not be detected until it may have had injurious or fatal effects.

The present universal system of so constructing water-closet bowls as to include the support or seat, the siphon, and the extension toward the sewer pipe in one piece of porcelain, with a tightly fitting hollow flanged surface as a base for the bowl upon the floor (whether that floor be stone or other material) makes a joint at the floor not only the important, but the vulnerable, point when either the house, the pipe, or the closet is subjected to strain. It is manifest, that any settling of the floor or twisting of the pipe will injure the joint, unless provision is made for sufficient freedom to prevent such result. The use of a section of lead pipe between the ordinary cast-iron soil-pipe and the porcelain spud which is the downward projection of the pipe in the bowl itself has afforded sufficient elasticity and yielding capacity, and has long been the ordinary method of construction. A correspondingly tight and strong joint between the top of the lead pipe and the porcelain spud is necessary, in order to give sufficient strength and rigidity to the porcelain bowl, thus causing any strain to be communicated to the yielding lead pipe. The close-fitting porcelain flange prevents access to the joint in question after the bowl has been set, and therein a radical difference must be noticed both in form of construction and the reasons therefor from the joints of sinks and similar structures, which are exposed and easy of access for the reasons above stated.

Without attempting to fix the exact scope of the ideas which Renton had in his mind at the time, it appears from the testimony that in the fall, or around December, 1901, he was experimenting upon improvements to floor-flanges or the joint-connections above described for porcelain bowl water-closets, and had as the object of such experiments a desire to obtain a strong and perfectly tight joint between a metal flange of cast material and the top of the lead or malleable pipe upon which the closet was to be set.

The testimony shows that at that time he had a brass model made, consisting of a flat flange with a vertical collar or ring, converging inward and downward, approximately four inches in diameter, the ordinary size of soil-pipe for the purposes in question. The angle or turn between the horizontal flange and the converging collar was beveled in such a way as to form an inverted conical section similar to the feature described in claims 3 and 6 of the patent, and used in practice as a recess or space for solder. In all such structures the malleable or lead pipe projecting up through this flange is hammered out

over this conical section and horizontal flange. The solder inserted between the two makes a tight and strong union.

It also appears from the evidence that at the time of these experiments Renton commented thereon to his brother, and made the statement that what the plumbers wished was a flange or ring with a collar of sufficient length to give some strength to the joint; and it is also apparent that at that time, and in all the experiments connected with this subject, he had in mind the use (at that time well known) of some packing-ring or gasket, which would be indispensable if any joint between the flange and the spud of the water-closet bowl was to be rendered impervious to gas and liquid.

The testimony of the complainant shows that for a space of approximately two years Renton was experimenting with the flange in question, and his own testimony is that he was endeavoring to find a suitable material to furnish a satisfactory gasket. At any rate in 1903, on the 30th of September, having concluded that an asbestos ring treated with plumbago would retain the quality of softness and at the same time form a tight joint, he filed an application for the patent in question. The brass mold or ring from which a wooden model was prepared gives no indication of how Renton in his experiments planned to compress the gasket between the flange and the bowl, nor how the bowl was to be fastened down. Other patents, which will be discussed later, were known in the trade, according to which the porcelain bowls or parts of the frame of the closet itself were fastened to the floor by bolts or screws, and when accurately set the spud of the bowl could thus be pressed tightly upon a gasket or other packing, and a tight joint would result until the fastenings of the bolt worked loose or some disturbance in the relations of the parts should occur.

The defendant has produced an exhibit, called "Defendant's Exhibit A," which according to the testimony of two witnesses was manufactured as early as September, 1902, by the defendant for the purpose in question, and this exhibit shows the flat flange, the converging ring, and the beveled conical section, with openings in the flange for the insertion of bolts, of which the heads would be buried under the flange and the thread-ends would project up through the base of the closet, substantially as described in Renton's patent.

Assuming this testimony to be accurate, meaning would be given to Renton's statement that the plumbers needed a flange with a sufficiently long collar to give it strength; but such a finding upon the testimony would defeat in its entirety the claims of the Renton patent, for it would indicate that Renton's device was confined to a modification or change in the form of the flange merely with respect to the length of the so-called collar or converging ring. But this Renton strenuously denies, while the defendant points out that the Patent Office rejected Renton's original application, in which the words "of substantial length" were not present in the description of the ring referred to, and that Renton thereupon amended all of his claims by the insertion of those words, and the patent was then allowed.

As a further commentary upon this question of the length of the ring, the exhibits offered as representing the defendant's structure, and also an alternative form of the flange manufactured under the

Renton patent, are substantially alike, and in each the ring has been shortened or made approximately of the length shown by Defendant's Exhibit A; it appearing that the saving of metal has been found consistent with sufficient strength of joint.

The general idea of fastening such a flange or a ring by bolts seems to have been adopted from the other class of joints, which have been passed over so far, and which have been called "sink-joints" as a general classification. It is evident that in a sink-joint the thread-end of the holding bolts would not be placed so as to project up through the bottom of the sink. When the positions are reversed, as in a floor-joint, it would not seem to require invention to make use of such a joint, by turning the bolts with the heads down and with the thread-ends exposed above the base or flange of the closet. Such a method of fastening had been also taught by a number of patents shown in the testimony with reference to floor-flanges or water-closet joints, and in the patents granted to Dellamore, No. 699,497, May 6, 1902 (application filed June 6, 1901), Delehanty, No. 682,046, September 3, 1901 (application filed December 7, 1900), Johnson & Martin, No. 679,459, July 30, 1901 (application filed November 23, 1900), and the Paradice patent, No. 653,524, July 10, 1900 (application filed July 1, 1899), such a method for fastening the flange to the base by inverted bolts is shown.

Leaving aside again the improvements in sink-joints, we find that at a period represented by the Bride patent, No. 303,615, August 19, 1884, and Bride patent, No. 274,434, March 20, 1883, the principle of a tight joint by a structure fastened to the floor was the recognized form for the so-called water-closet joint and it must be held that the knowledge of the trade had advanced to such a point at the time of Renton's experiments that the recognized method of fastening the joint in question was by bolts whose heads were buried in the flange or structure upon which the gasket was intended to be compressed. It would also appear, from such patents as Johnson & Martin, Delehanty, and Dellamore, above referred to, that the idea of turning over the upper portion of the lead pipe and of the insertion of packing around the top of the pipe was known, and in the Delehanty patent solder was used to fasten the flange to the end of the pipe.

It is difficult to see, therefore, how Renton can claim either the invention of the different elements going to make up his flange or the right to their combination as invention, unless that combination and his invention be limited to the single style constructed with a converging wall or ring of considerable length, as suggested in the patent. It is stated by both the defendant and the complainant that no difference, whether under the patent or in practical application, results from the use of a long ring, after a point has been reached where the ring furnishes sufficient strength and a holding surface to meet the requirements of the situation. The structures produced by the defendant (both that now made by him and that made by the complainant) do not so depart from the designs shown in the earlier patents as to justify a finding of invention, either in the shape of the flange or in the combination of parts, except in the one particular that the complainant's device combines the good qualities of these other patents with a strong and simple form of construction, of value commercially,

worthy of patenting as an invention if worked out at a time when others were not in possession of the same commercial ideas.

There is no need of discussing infringement, inasmuch as the two structures are to all intents and purposes the same, and the complainant, upon the testimony, secretly holding his application for patent for a period of nearly two years, while he was experimenting with material for a satisfactory gasket, did not thereby lose the right to apply for a patent at the time he did file his application.

We need not discuss the different language of the separate claims, and the variations of claims 2 and 3 or 5 and 6 from the general ideas of claims 1 and 4; for the broad claims are anticipated, and the more specific claims do not show invention by describing the precise style of structure itself which we have been considering. The so-called "combination" claims (4 to 6) are in reality merely detailed statements of the method of applying the devices described in claims 1 to 3, and do not thereby disclose anything more than claims 1 to 3. The whole patent seems to have been woven around a structure worked out by Renton, as well as by others, to make the soldered joint strong and tight by improvements or mechanical methods which were obvious and could not be called invention.

The defendant should have a decree.